IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FRIENDS OF THE BITTERROOT, | CV 20–19–M–DLC |
| Plaintiff, | |
| vs. | |
| LEANNE MARTEN, Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICE; an agency of the U.S. Department of Agriculture, | ORDER |
| Defendants. | |

Four motions are pending before the Court: (1) Plaintiff Friends of the Bitterroot's Motion for Summary Judgment (Doc. 15); (2) Defendants Leanne Marten and the United States Forest Service's Cross Motion for Summary Judgment (Doc. 18); (3) Defendants' Motion to Strike (Doc. 22); and (4) Plaintiff's Motion to Strike (Doc. 25). For the reasons explained, the parties' motions for summary judgment are granted in part and denied in part. Plaintiff prevails in its challenge to the minimum road system. Defendants prevail in all other respects.

## BACKGROUND

The Darby Lumber Lands Phase II Project (the "Project") is a vegetation management Project located east of Darby, Montana near the center of the

Bitterroot National Forest.  AR 000336.  The Project is a continuation of the watershed improvement and transportation work conducted in the Darby Lumber Lands Phase I Project, and was developed to design and implement a suitable transportation system for the area, improve forest health and stand resilience, reduce potential fire severity, and provide timber products and related jobs.  *Id.*

The Project area encompasses former privately-owned lands which, prior to the United States' acquisition, were managed for heavy timber production resulting in an extensive road network throughout the Project area.  *Id.*  Many of these roads were not built to Forest Service standards and have not been properly maintained, resulting in heavy sedimentation.  *Id.*

The Project will construct 4.3 miles of permanent road, decommission 39 miles, and place 16 miles into storage.  AR 000340.  The Project will log approximately 959 acres and conduct prescribed burns across 1,274 acres.  *Id.*  To accomplish its goals, the Forest Service issued a Project-specific forest plan amendment to exempt the Project from compliance with Forest Plan standards related to elk habitat effectiveness and thermal and hiding cover.  AR 000341.

## LEGAL STANDARDS

### I.    The National Environmental Policy Act

The National Environmental Policy Act ("NEPA") "has twin aims.  First, it places upon [a federal] agency the obligation to consider every significant aspect

of the environmental impact of a proposed action.  Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc*., 462 U.S. 87, 97 (1983) (internal quotations and citations omitted). "NEPA is a procedural statute that does not mandate particular results but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639–40 (9th Cir. 2004) (internal citations and quotation marks omitted); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) (stating that NEPA "prohibits uninformed—rather than unwise—agency action").

Before undertaking any "major Federal action significantly affecting the quality of the human environment," an agency must prepare a detailed environmental impact statement.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11.  In order to decide whether a project is a "major Federal action significantly affecting" the environment and therefore requires a full environmental impact statement, an agency may prepare an environmental assessment.  40 C.F.R. § 1508.9.  This is a "concise public document" that "briefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement." *Id.*  If,

after preparation of an environmental assessment, the agency concludes the proposed action will not have a significant effect on the environment, the agency may issue a Finding of No Significant Impact and may then proceed with the action without further documentation. 40 C.F.R. § 1508.13.

## II.     The National Forest Management Act

The National Forest Management Act ("NFMA") requires forest planning of national forests at two levels: the forest level and the individual project level. 16 U.S.C. §§ 1600–1687. At the forest level, NFMA directs the Department of Agriculture to "develop, maintain, and, as appropriate, revise [forest plans] for units of the National Forest System." 16 U.S.C. § 1604(a). A forest plan sets broad guidelines for forest management and serves as a programmatic statement of intent to guide future site-specific decisions within a forest unit. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003); *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729 (1998). Forest plans must "provide for multiple use and sustained yield of the products and services" derived from the national forests, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). At the individual project level, NFMA requires that each project be consistent with the governing forest plan. *Great Old Broads for Wilderness v. Kimbrell*, 709 F.3d 836, 851 (9th Cir. 2013).

The Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003). This deference may be set aside only where an agency takes a position that is "contrary to the clear language" of the forest plan. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 962 (9th Cir. 2005).

## III.    The Travel Management Rule

Subpart A of the Travel Management Rule, 36 C.F.R. §§ 212.1 to 212.21, is intended to limit the harmful ecological impacts of roads within national forests by requiring each forest to identify its "minimum road system." The minimum road system is the road system:

> needed to meet resource and other management objectives adopted in the relevant land and resource management plan (36 CFR part 219), to meet applicable statutory and regulatory requirements, to reflect long-term funding expectations, to ensure that the identified system minimizes adverse environmental impacts associated with road construction, reconstruction, decommissioning, and maintenance.

36 C.F.R. § 212.5(b)(1). The agency is also required to identify roads that are no longer needed to meet forest resource management objectives and that, therefore, should be decommissioned or considered for other uses, such as trails. *Id.* § 212.5(b)(2).

Identification and implementation of a minimum road system is a two-step process. In the first step, the Forest Service conducts a science-based roads

analysis and develops a recommended road system for a given area. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1117 (9th Cir. 2018). This recommendation is not a final agency decision until it is adopted in step two through the NEPA process. *Id.*

## IV.   Summary Judgment

When a district court reviews an agency decision, summary judgment is the "appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *City & Cty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985)). Generally summary judgment is appropriate when "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In an APA case, however, the summary judgment standard is modified by the APA. A court may not overturn an agency's decision unless it is arbitrary and capricious. *City & Cty. of San Francisco*, 130 F.3d at 877.

Under this standard:

[A]n agency must examine the relevant data and articulate a satisfactory explanation for its action. An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law.

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 746 F.3d 970, 974 (9th Cir. 2014)

(internal citation and quotation marks omitted).

While the APA requires a "thorough, probing, in-depth review" of agency

action, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)

*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), the

standard of review is nonetheless "highly deferential," *Nw. Ecosystem All. v. U.S.

Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007).  If the court finds the

existence of a reasonable basis for the agency's decision, it must presume the

validity of, and affirm, the agency action.  *Id.*

## DISCUSSION

Plaintiff argues that the Project is unlawful because: (1) the Forest Service

designated a minimum road system without meeting the necessary regulatory

requirements; (2) failed to demonstrate compliance with Management Area 8b of

the Forest Plan; and (3) issued a site-specific Forest Plan Amendment without

adhering to the standards for doing so.  The Court will first address the parties'

motions to strike.  It will then turn to the merits, addressing the minimum road

system last.

### I.    Defendants' Motion to Strike

Plaintiff submitted two declarations along with its motion for summary

judgment: the declaration of Friends of Bitterroot member Jeff Lonn (Doc. 16-1)

and the declaration of retired biologist and member James Miller (Doc. 16-2).

Defendants move to strike certain paragraphs in each of these declarations as an

improper attempt to supplement the administrative record.  (Doc. 23 at 2.)

Under the APA, a court reviewing an agency's decision is instructed to

"review the whole record or those parts of it cited by a party."  5 U.S.C. § 706.

"The whole record" is "everything that was before the agency pertaining to the

merits of its decision," *Portland Audubon Soc. v. Endangered Species Comm.*, 984

F.2d 1534, 1548 (9th Cir. 1993), which includes "all documents and materials

directly or indirectly considered by agency decision-makers," *Thompson v. U.S.*

*Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citations omitted).  The agency

is entitled to a presumption that the record is complete, although this presumption

may be overcome by demonstrating one of four narrow exceptions.  *Native*

*Ecosystems Council v. Marten*, 334 F. Supp. 3d 1124, 1129 (D. Mont. 2018)

(citing *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005)).

A district court may supplement or complete the administrative record:

> (1) if admission is necessary to determine "whether the agency has
> considered all relevant factors and has explained its decision," (2) if
> "the agency has relied on documents not in the record," (3)
> "when supplementing the record is necessary to explain technical terms
> or complex subject matter," or (4) "when plaintiffs make a showing of
> agency bad faith."

*Id.*

Plaintiff argues that both declarations may be admitted as "necessary to determine whether the agency has considered all relevant factors and explained its decision" and "necessary to explain technical terms or complex subject matter." (Doc. 24 at 2.)

The challenged paragraphs in Lonn's declaration generally document Lonn's belief that the Forest Service violated the Forest Plan's road building restrictions in Management Area 8b by authorizing Road 74895-1, a new segment of permanent road. (Doc. 16-1 at 4–5.) Lonn argues that, contrary to the Forest Service's position, Road 74895-1 is not necessary to access treatment units in Management Area 2 because there are other existing routes that provide better access. (*Id.*)

Plaintiff has not convinced the Court that the Forest Service's analysis is missing any fundamental components simply because Mr. Lonn believes otherwise. Moreover, the content in his declaration is not necessary to explain complex or technical subject matter. Although the planning and construction of roads no doubt requires technical expertise, there is nothing so complex in the ideas conveyed by the Forest Service regarding Road 74895-1 that require demystifying. The Court grants Defendants' motion to strike the challenged portions of Lonn's declaration.

The Miller declaration was drafted primarily to rebut statements contained in a declaration Defendants attached to its response in opposition to Plaintiff's motion for a preliminary injunction. In that declaration, District Forest Ranger Eric Winthers explained that Road 74895 was necessary to provide safe egress to the east of the Meadow Lake Estates community in the event of a wildfire. (Doc. 10-1 at 4–5.) Miller takes issue with Winthers' assertion that Road 74895 provides safe egress as it leads through a densely forested area, calling it an "illogical exit strategy." (Doc. 16-2 at 5.)

Contrary to Plaintiff's assertion, the Miller declaration is also not necessary to determine whether the agency considered all relevant factors nor is it necessary to explain any technical or scientific ideas or terminology. In fact, the challenged portions are entirely superfluous. Defendants introduced the Winthers declaration for the limited purpose of opposing Plaintiff's motion for a preliminary injunction. Defendants do not continue to rely on the Winthers declaration in defending the Forest Service's authorization of Road 74895-1, nor, in addressing the merits, do they argue that Road 74895-1 is necessary to provide safe egress. The Court grants Defendants' motion to strike the Miller declaration.

## II.     Plaintiff's Motion to Strike

Plaintiff moves to strike: (1) a demonstrative exhibit prepared by Defendants comparing the road treatments recommended by the Travel Analysis Report and

the minimum road system adopted by the Project (Doc. 20-1); (2) The declaration of Eric Winthers submitted with Defendants' opposition to Plaintiff's motion for a preliminary injunction (Doc. 10-1); (3) a post-decisional map demonstrating the slope of current Road 74895 and explaining the Forest Service's decision to relocate segment 74895-1 (AR 015583); and (4) The Darby Lumber Lands II— Master Table of existing routes (AR 015480–81). Plaintiff argues that each of these documents was developed after the Decision Notice was issued and that the Forest Service is improperly relying on these documents to supplement deficiencies in the Environmental Assessment. (Doc. 26 at 2.)

Defendants first argue that Plaintiff's motion to strike is untimely. (Doc. 30 at 6.) The May 28, 2020 deadline to which Defendants refer was the deadline to submit a motion to supplement, complete or otherwise challenge the *sufficiency* of the administrative record. (Doc. 13 at 1.) In other words, that was the deadline for any party seeking to expand the record, not limit it. Plaintiff's motion is not untimely.

Nevertheless, the Court will admit Defendants' demonstrative exhibit comparing the Travel Analysis Report's recommendations with the Project's minimum road system. (Doc. 20-1.) This exhibit does not contain any information that is not already present in the administrative record, *compare* AR 008960–72

*with* AR 000388–02, and was developed by Defendants for the Court's ease in understanding its argument.

The Court denies as moot Plaintiff's request to strike the Winthers Declaration.  (Doc. 10-1.)  That declaration was created solely for the purpose of responding to Plaintiff's motion for a preliminary injunction and is not relevant to any briefing on summary judgment.

As for the map pertaining to Road 74895, Defendants do not dispute this map is post-decisional.  (Doc. 30 at 6.)  Instead, they argue that the map may be admitted under the exception to explain technical terms or complex subject matter. In other words, Defendants argue that this map, AR 015583, is necessary for the Court to understand what the Forest Service meant when it indicated that Road 74895 did not meet "minimum road standards for grade."  The Court requires no demonstrative aid to glean that this means the road contains a steep slope. Plaintiff's motion to strike this map is granted.

Finally, the Court denies Plaintiff's motion to strike the Master Routes Table.  This too is used as a demonstrative exhibit to more clearly explain the current road mileage figures in the Project area.  In sum, the Court grants in part and denies in part Plaintiff's motion to strike.

### III.    Management Area 8b

Plaintiff argues that the Project's road construction and timber harvest in Management Area 8b violates NFMA, NEPA, and the APA.  As pertinent here, the Forest Plan restricts Management Area 8b by prohibiting timber harvest except "to improve winter range forage production" and prohibiting road construction except "if require[d] to access adjacent management areas[.]"  AR 001151–52.  The Decision Notice authorizes timber harvest, construction of temporary roads, and the rerouting of a portion of a permanent road within Area 8b.  The Court will address Plaintiff's arguments in the order raised.

#### A. Temporary Road Construction

The Decision Notice authorized construction of several temporary roads within Management Area 8b.  AR 000354.  These roads are not necessary to access adjacent management areas; they are necessary only for harvesting within 8b— which the Forest Service considers to be a high priority given the area's designation as wildland urban interface.  AR 000233.  The Forest Service explains that it does not construe temporary road construction to violate Area 8b's prohibition on road construction because "[t]emporary roads are not considered Forest System roads; they are rehabilitated and returned to the productive land base upon completion of harvest activities."  *Id.*

Plaintiff argues this interpretation is "illogical and not supported by the record" by which it means the Forest Service Handbook.  (Doc. 16 at 21.)  To the contrary.  The Forest Service's position relies on a reasonable interpretation of the Handbook.

Under the subheading "Road Systems," the Forest Plan provides the general rule that "[r]oads will not be built to access any of . . . [Management Area 8b]," AR 001152, but the Forest Plan does provide a definition of a "road." Nevertheless, the Forest Service Handbook explains that a "National Forest System Road" is "[a] Forest road other than a road which has been authorized by a legally documented right-of-way held by a State, county, or local public road authority[.]" AR 004702.  While a "Temporary Road" is "[a] road . . . necessary for emergency operations or authorized by contract, permit, lease, or other written authorization *that is not a Forest road* and that is not included in a Forest transportation atlas[.]" *Id.*  In sum, the Handbook states that a temporary road is "not a forest road" while a National Forest System Road *is* "a Forest road."  Because the Forest Plan specifically applies to "system" roads, it was reasonable for the Forest Service to conclude that the construction of temporary roads does not create National Forest System Roads and is therefore not prohibited by the Forest Plan—an interpretation that is entitled to "substantial deference."  *Native Ecosystems Council v. Weldon*,

697 F.3d 1043, 1056 (9th Cir. 2012) (citing *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003)).

**B. Permanent Road Construction**

In addition to temporary road construction, the Forest Service authorized the relocation of one segment of permanent road within Area 8b.  Road 74895 currently runs through a portion of Management Area 8b.  (*See* Doc. 19 at 18 (citing AR 000354, 005533, 014613).)[1]  The Forest Service deemed a segment of this road unsuitable for use as a haul route because of its steep grade.  AR 000220.  The relocated road segment (designated as Road 74895-1) will remain in Area 8b but will be moved further from the eastern boundary presumably to avoid the steep hill.  *Id.*  In the final Environmental Assessment, the Forest Service explained that "[t]he road relocation is necessary to access units in [Management Area] 2 to the North of [Management Area] 8b[,] and the current segment does not meet minimum road standards for grade.  The portion of [National Forest System Road] 74895 not meeting standard will be decommissioned, treated, and returned to the productive land base."  AR 000220.

---

[1] Plaintiff argues that the Forest Service has inconsistently portrayed the location of Road 74895 in relation to the boundary of 8b.  (Doc. 28 at 15–16.)  The Court does not believe any difference is significant.  The original map portrays the boundary of 8b occurring at the road.  (Doc. 14-2 at 3–5.)  Elsewhere, the Forest Service portrays the boundary of 8b ending .2 miles beyond the road.  (Doc. 19 at 20.)  Whether the boundary ends with Road 74895 or past it, neither map clearly shows Road 74895 as excluded from Area 8b.  The Court therefore agrees with Defendants' explanation that both maps show Road 74895 as included within 8b.

Plaintiff asserts that that the Forest Service's decision to relocate a portion of permanent Road 74895 within Area 8b violates NFMA and NEPA because the Forest Service failed to explain why Road 74895 is necessary when there are other roads that access Management Area 2.  (Doc. 16 at 23.)  Plaintiff believes the administrative record contains a dearth of information regarding the necessity of moving the road, the current condition of the road, the grade requirements, and argues that the record fails to explain what additional access the newly rerouted segment provides, and fails to provide accurate boundary lines for Area 8b.  (*Id.* at 24–25.)

Defendants argue that the Court is required to defer to the Forest Service's determination that rerouting a portion of road is necessary because road construction is a scientific and technical field.  (Doc. 19 at 22 (citing *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005).)  Defendants further assert that the record provides support for the Forest Service's conclusion that Road 74895 is necessary to access units to the north *and south*— although the Forest Service inadvertently omitted mentioning the southern units in its analysis.  (Doc. 19 at 19–22.)  In response to Plaintiff's NEPA challenge, Defendants recognize that some maps in the administrative record show the boundary line of Management Area 8b .2 miles further to the east than other maps, but contends this discrepancy is harmless error.  (Doc. 19 at 25.)

First, the Court agrees with Defendants that the necessity of road reconstruction and realignment is an area to which the Court must defer to the agency's expertise.  However, the Court is not convinced that the proscription in the Forest Plan even applies to this road work.  The Forest Plan states that "[r]oads will not be built to access any of this area" and contains an exception for roads that are necessary to access adjacent treatment units.  The road at issue here is not being built—it is already present within 8b.  It is not clear that road rerouting even falls within the scope of the rule.

Nevertheless, the Forest Service sufficiently explained that a portion of Road 74895 was not suitable for the Project's activities because it did not meet minimum road standards for grade which is why it chose to relocate a small road segment. AR 000220.  It then explained that the entire road provided crucial access to treatment units in Management Area 2 to the north.[2]  *Id.*  To the extent Plaintiff wishes the Forest Service had explained why every other road in the surrounding area was less suitable, this level of detail is not necessary where the Forest Service provides a cogent explanation for its decision.  Nor does the information Plaintiff wishes to see give rise to an independent NEPA violation.  The record displays

---

[2] In its Reply brief, Plaintiff argues that the Forest Service's statement that roads are "necessary to access *units* in the adjacent management area" does not meet the standard which is "required to access adjacent management areas."  (Doc. 28 at 10.)  This is a distinction without a difference.  Because the units are located within an adjacent management unit, the standard is met.

Road 74895 as running parallel to the boundary line of Management Area 8b and providing access to the northern section of Management Area 2.[3]  The Forest Service's decision to use this road and reroute a portion of it is reasonable and supported by the record.

Nor does a mapping error of less than .2 miles constitute a NEPA violation. As Defendants note, and the Court agrees, *see supra* n.1, any error here is harmless.  (Doc. 19 at 25.)

### C. Timber Harvest

Finally, Plaintiff argues that the Project's proposed timber harvest in Area 8b violates NEPA and the APA because the Forest Service failed to demonstrate it took a "hard look" in light of contradictory information provided in the cumulative effects analysis.  (Doc. 28 at 16–17.)

The Forest Plan prohibits timber harvest "except to improve winter range forage production" in Management Area 8b.  AR 001151.  Here, the Forest Service authorized timber harvest in Area 8b after it concluded that "[e]lk would likely benefit from timber treatments.  Winter range would be improved with increased stimulation of forage."  AR 000262.  However, the Forest Service also noted that "[h]iding cover would likewise be reduced in sub-watersheds where timber

---

[3] It also appears to provide access to the southern portion of Management Area 2, although, given the omission of any mention of the southern units in the Project's documentation, the Court does not affirm on this rationale.

treatments are proposed, potentially making elk more vulnerable to predators and hunters." *Id.* So on one hand, the timber treatments are anticipated to benefit elk by producing more food but on the other hand, those same treatments may cause harm to elk from predators. Noting these conflicting trends, the Forest Service explained that "[i]n summary, treatments would result in offsetting the confounding effects of increased forage potential, structural suitability, changes in the balance of interspecific competition and temporal and spatial resource selection between big game species, livestock, predators, and recreational hunters" AR 000263—meaning, that although elk may benefit from increase winter forage, no net beneficial effects are anticipated.

Plaintiff argues that this concession undermines the Forest Service's conclusion that timber harvest is warranted by the Project—but the Forest Plan never said that timber harvest is only permitted to the extent that all habitat factors are improved. The Forest Plan mandate is specifically tailored to "winter range forage production." AR 001151. The Forest Service's conclusion that "[w]inter range would be improved with increased stimulation of forage" as a result of the treatment activities planned in Area 8b complies with the Forest Plan and NEPA. Defendants are granted summary judgment on this issue.

### IV.   The Forest Plan Amendment

Plaintiff argues that the Forest Service violated the 2012 Planning Rule, 36 C.F.R. § 219.8–219.11, and the APA when it issued a site-specific Forest Plan Amendment suspending various standards related to elk habitat effectiveness and hiding cover.  (Doc. 16 at 31.)  Specifically, Plaintiff argues that the Forest Service suspended three Forest Plan standards but failed to provide replacement standards in violation of 36 C.F.R. § 219.10(a)(5), failed to use the best available science, and failed to justify the need for a site-specific (as opposed to forest-wide) amendment based on a unique characteristic of the Project area.  (*Id.* at 31–36.)

Turning to Plaintiff's first claim, Defendants assert that no replacement standards are necessary where, as here, the Forest Service considered habitat conditions that bear on multiple use and determined that the area would not be degraded by suspending those standards.  (Doc. 19 at 29–32.)

Defendants have the better argument.  The 2012 Planning Rule provides substantive requirements for each forest plan and dictates various components that must be included in each plan, including standards, objectives, and guidelines.  36 C.F.R. §§ 219.7, 219.10.  A forest plan standard "is a mandatory constraint on project and activity decisionmaking, established to help achieve or maintain the desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements."  *Id.* § 219.7(e)(1)(iii).  While forest plans are

required to be revised every 15 years, they may be amended "at any time." *Id.*

§§ 219.7, 219.13(a). The Forest Service may amend a forest plan "in any manner

whatsoever," 16 U.S.C. § 1604(f)(4), and maintains discretion "to determine the

scope and scale of any amendment," 36 C.F.R. § 219.13(a). For each amendment,

the Forest Service must "[d]etermine which specific substantive requirement(s) . .

. are directly related to the plan direction being added, modified, or removed by the

amendment and apply such requirement(s) within the scope and scale of the

amendment." *Id.* § 219.13(b)(5).

Here, the Forest Service issued a site-specific Forest Plan amendment that

suspends three standards, two of which relate to elk habitat effectiveness[4] (one is

forest-wide and one is particular to Management Area 2), and one forest-wide

standard relating to thermal and hiding cover. AR 000328. The Forest Service

determined that its amendment related to its substantive requirement to consider

"habitat conditions . . . for wildlife, fish, and plants commonly enjoyed and used by

the public[] for hunting . . . and other activities," 36 C.F.R. § 219.10(a)(5), which

required application of this requirement "within the scope and scale of the

amendment." *Id.* § 219.13(a). In other words, by suspending standards related to

---

[4] Elk habitat effectiveness is "an index of the capability of an area to provide security for elk. It
is based on hiding and thermal cover present and roads open to public motorized use." AR
001201. The Forest Plan standards related to habitat effectiveness rely on road density as a
proxy for effectiveness as suggested by Lyon et al. (1983). *Id.*

elk habitat for the duration of the Project, the Forest Service was required to demonstrate that the Project would not degrade elk habitat to the extent that it jeopardized the public's ability to observe and hunt elk in the area.

Turning first to the standards addressing elk habitat effectiveness, the Forest Service determined that the Project's road work would not impact that number of third order drainages[5] that currently meet habitat effectiveness standards.  AR 000330.  When taking into account the Project's seasonal road closures, the Forest Service then determined that only three third order drainages would not comply with the elk habitat effectiveness standards after Project implementation.  *Id.* Nevertheless, it concluded that the Project's net reduction in roads will decrease overall road density in the Project area which is expected to benefit elk populations as fewer roads offers greater security and decreases the number of hunters in an area.  *Id.*  Contrary to Plaintiff's argument, the Forest Service did not arbitrarily fail to replace the elk habitat effectiveness standards with another protective standard because it determined that elk populations were sufficiently protected even in the absence of those standards.

---

[5] The Bitterroot National Forest Plan classifies certain drainages as "third order" referencing stream ordering.  AR 001231.  A "first-order stream" is one that has no tributary.  *Id.*  A "second-order stream" is one formed by the confluence of two or more first order streams.  *Id.*  A "third-order stream" occurs in the confluence of two or more second-order streams.  *Id.*

Addressing the standard relating to thermal and hiding cover, the Forest Service explained that at the time this standard was developed, thermal cover was believed necessary to winter-time survival rates, however, more recent research calls that belief into question.  AR 000329.  Cook et al. (1998) found "no significant positive effect of thermal cover" on winter-time elk survival.  *Id.*  The Forest Service also explained that over 80% of sub-watersheds in the Project area currently do not meet the thermal cover Forest Plan standard.  *Id.*  Yet, despite this, elk populations continue to thrive in the Project area which has caused the Forest Service to question the necessity of the standard relating to winter range thermal cover.  *Id.*  Turning to hiding cover, the Forest Service disclosed that currently 50% of sub-watersheds are below hiding cover standards, yet population numbers continue to remain robust.  AR 000330.  In sum, the Forest Service concluded that the Project will generally improve elk habitat and that "population growth [has] not [been] significantly adversely effected by not meeting Forest Plan standards."  *Id.*  Given this conclusion, it was not necessary for the Forest Service to provide replacement standards for those it withdrew.

 Plaintiff next complains that the Forest Service failed to use the best available science when it withdrew the elk habitat standards.  (Doc. 16 at 33–34.)  In the Plan Amendment Discussion, the Forest Service explained:

> The [elk habitat effectiveness] model described by Lyon was the best information available at the time the Plan was implemented.

> Subsequently, a model developed by Hillis et al. (1991) has been used
> in Bitterroot National Forest project planning to maintain elk security
> during hunting season when elk are most vulnerable.

AR 000329.  Plaintiff argues that Hillis is the best available science but notes that

the Forest Service failed to disclose how Hillis defines elk habitat effectiveness

and failed to explain how Hillis was applied to the Project.  (*Id.* at 34.)  The Court

agrees the reference to Hillis provides slim insight yet fails to see why it matters.

It is not clear that the Forest Service relied on any factor specific to Hillis

when it concluded that habitat conditions in the Project area would be improved by

net reductions in road mileage.  AR 000330.  The observation that decreased road

density improves elk security is a general scientific principle, and Plaintiff does not

argue that this principle has been debunked.

Finally, Plaintiff cites *League of Wilderness Defenders/Blue Mountains

Biodiversity Project v. Connaughton*, 2014 WL 6977611, *27 (D. Or. 2014) and

*Lands Council v. Martin*, 529 F.3d 1219, 1228 (9th Cir. 2008) for the proposition

that to justify its decision to issue a site-specific amendment, the Forest Service

must point to some unique characteristic in the Project area.  (Doc. 16 at 34–36.)

The Forest Service relied on the small size of watersheds to justify its withdrawal

of the elk habitat effectiveness standards.  AR 000328.  Plaintiff contends that

small watersheds (which make up 17% of the Project area) are not a unique

characteristic when that percentage is reflective of the Bitterroot National Forest at

large (where such watersheds make up 19% of the forest).  (Doc. 16 at 35–36.)

Stated differently, Plaintiff believes small watersheds are a site-specific

characteristic only if they occur with greater frequency in the Project area than

elsewhere on the Forest.  Defendants argue that Plaintiff's interpretation of *Lands*

*Council* imposes a more demanding standard than the court required.  (Doc. 19 at

33.)

Defendants are correct.  In *Lands Council*, the Ninth Circuit required that a

decision to implement a site-specific amendment requires site-specific

characteristics, but the court never used the word "unique."  *Id.*  After a wildfire

burned 28,000 acres of the Umatilla National Forest, the Forest Service initiated a

timber salvage project which authorized logging of 9,423 acres of dead or dying

trees.  *Id.* at 1222.  Within the project area, the forest plan prohibited logging "live

trees" with a diameter of 21 inches or more.  *Id.* at 1222–23.  The project was

initially enjoined when the Ninth Circuit determined that the decision to log dying

trees violated the plain language of the forest plan because dying trees are not

dead; they are still "live trees."  *Id.* at 1223.  Then, on remand, the Forest Service

supplemented its environmental impact statement to contain a site-specific forest

plan amendment to exclude dying trees from the logging prohibition.  *Id.* at 1223–

24.  Once again, the plaintiffs challenged the project arguing, inter alia, that the

decision to pursue a site-specific amendment was arbitrary.  *Id.* at 1224.  This time,

however, the Ninth Circuit upheld the project finding the decision to amend the definition of live trees reasonable given that it was tailored to a site-specific characteristic—in this case, trees affected by wildfire. *Id.* at 1128. The court considered the effects of wildfire to be a site-specific characteristic even though the project area itself was smaller than the overall fire—meaning that the adjacent forest acreage also contained burned trees.

Similarly, in *Native Ecosystems Council v. Dombeck*, the Ninth Circuit upheld the Forest Service's decision to issue a site-specific amendment exempting a timber sale project from compliance with a road density standard. 304 F.3d 886, 898 (9th Cir. 2002). The court deferred to the Forest Service's expertise in determining the scope of the amendment and did not require it to justify that the project area was more heavily roaded than the rest of the forest. *Id.* at 900. Taken together, *Lands Council* and *Native Ecosystems* undercut Plaintiff's argument that a site-specific characteristic must be one that is unique and therefore not present anywhere else on the forest.

Here, the Forest Service explained that suspending the elk habitat effectiveness standards was necessary given the small size of watersheds in the Project area. AR 000328. Without the amendment, the Forest Service explained that it would have to close additional roads which would, in turn, limit forest management access and conflict with other multiple use management objectives.

*Id.* Following *Lands Council* and *Native Ecosystems*, the Forest Service's belief that small watersheds justify the amendment is reasonable because the Forest Service "articulate[d] a rational connection between the facts found and the choices made," *Lands Council*, 529 F.3d at 1228 (quoting *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001), based on a site-specific characteristic.[6]

As for the hiding cover standard, the Forest Service asserted that "changes in the landscape"—presumably, the "widespread dense regeneration resulting from the 2000 Valley Complex Wildfire"—supported the amendment.  AR 000328–30. Plaintiff does not argue that this is an inadequate justification.  Accordingly, Defendants are granted summary judgment on this issue.

## V.    The Minimum Road System

Plaintiff argues that the Forest Service's disclosure and analysis of the minimum road system violates the Travel Management Rule, NEPA, and the APA. Specifically, Plaintiff asserts that the Forest Service: (1) failed to conduct the required analysis in 36 C.F.R. § 212.5(b)(1); and (2) adopted a road system "substantially different" than the recommendation made in the Darby Lumber Lands Travel Analysis Report without sufficiently disclosing the particulars of the

---

[6] Defendants also argue that the abundant elk populations in the Project area are also a site-specific characteristic (Doc. 19 at 33–34) but the Forest Service does not appear to rely on this factor to justify the amendment.  *See* AR 000328.

system it adopted or how it differed from the recommendation.  (Doc. 16 at 10–16.)

Defendants first argue that the minimum road system adopted for the Project area was only minimally different than the one recommended in the Travel Analysis Report—in fact, it differed by only 3.6 miles or 1.6%.  (Doc. 19 at 10–11.)  Defendants next assert that the analysis of the factors listed in 36 C.F.R. § 212.5(b)(1) can be found by looking to the forest-wide Travel Management Planning Project, the "finer-scale" Darby Lumber Lands Phase I and II Travel Analysis Report, and the Environmental Assessment.  (Doc. 19 at 12–13.)  This is, in effect, a tiering argument.  Defendants acknowledge that the Environmental Assessment alone does not contain the required analysis but argues that the Court may find a comprehensive discussion by looking to the planning level documents.

The minimum road system is the road system necessary: (1) to meet "resource and other management objectives" consistent with the forest plan; (2) to meet applicable statutory and regulatory requirements"; (3) to reflect "long term funding expectations"; and (4) to ensure the road system "minimizes adverse environmental impacts associated with road[s.]"  36 C.F.R. § 212.5(b)(1).  In *Alliance for the Wild Rockies*, the Ninth Circuit upheld a minimum road system which differed from the one recommended in the Travel Analysis Report by retaining 161 additional miles of road.  907 F.3d at 1118.  The plaintiffs argued

that this deviation rendered the landscape restoration project in violation of the Travel Management Rule and the APA, but the court disagreed. *Id.* at 1109, 1118. The court held that because the "Forest Service fully explained its decision . . . and considered each of the factors listed under 36 C.F.R. § 212.5, . . . the Project's [minimum road system] designation was not arbitrary and capricious." *Id.* at 1118.

Admittedly, it is not clear to what extent *Alliance*'s holding that a factors analysis is required for a decision adopting a minimum road system is tailored to the circumstances. Does *Alliance* instruct that a factors analysis is required when the Forest Service adopts a decision that is substantially different from the one recommended in a Travel Analysis Report? Or did the court imply that a factors analysis is required for every decision implemented under 36 C.F.R. § 212.5(b)(1)? Defendants dodged the question at oral argument by asserting that *Alliance* is distinguishable given the posture of the issue—that the forest-wide road system deferred a decision on Darby Lumber Lands. Plaintiff argued that the regulation governs every agency action—which is the stronger argument.

Although 36 C.F.R. § 212.5(b)(1) requires a substantive analysis and does not expressly say this analysis must be contained in NEPA documentation, the regulation directs the agency to consider substantive factors, and "to the degree practicable, involve a broad spectrum of interested and affected citizens" before reaching a decision—a task that echoes the procedural requirements of NEPA.

Moreover, the Travel Analysis Report repeatedly emphasized that it did not

involve the public as it was not subject to the NEPA process.  AR 008925,

008928–29.

Having determined that the analysis of the four factors present in 36 C.F.R.

§ 212.5(b)(1) must be present in the NEPA documentation, Plaintiff's contention

that the minimum road system adopted is "drastically different" than the one

recommended is irrelevant.[7]  The only question is whether the Forest Service

conducted the requisite analysis.

Setting aside for a moment whether it was permissible for the Environmental

Assessment to tier to the Travel Analysis Report and Bitterroot Travel

Management Plan, Defendants do not even argue that an analysis of each factor is

present across all documents.  Defendants assert that the forest-wide analysis

considered "operation, maintenance, [] funding," and contained a "financial

analysis", that the Travel Analysis Report described the existing condition and

considered the Forest Plan direction, and that the Environmental Assessment

examined the road system's effects on a variety of resources including aquatics,

recreation and trails, and the transportation system.  (Doc. 19 at 13.)  But

---

[7] This argument is also speculative.  The extent to which the minimum road system differs from the recommendation is not clear as the Travel Analysis Report was not made on the Project level. Defendants' assertion that only 1.6% of the Project's road differ from the recommendation is somewhat misleading as it only accounts for the Project's intended road work.  The Project's treatment of the minimum road system simply does not disclose to what extent it differs from the recommendation, but the Court is skeptical the difference can be characterized as "substantial."

Defendants do not explain where the Court can find an analysis of the statutory and regulatory requirements.

It is unsurprising that the forest-wide Bitterroot Travel Management Plan does not contain any discussion of the legal requirements that guide the development of the minimum road system as the "the Travel Management Planning Project [does] not establish a 'minimum road system'[.]" AR 004638. This means the Forest Service "did not consider every road, trail, and area for possible change of designation" and instead opted to "follow the regional strategy for identifying unneeded roads and trails through project level or watershed level analyses[.]" *Id.* Defendants' contention, then, that the Environmental Assessment may be tiered to the Travel Management Plan's discussion of operation, maintenance, and funding of its road system, is inapposite as the Travel Management Plan does not contain any discussion of these factors as applicable to the development of a minimum road system. Moreover, any analysis contained in the Darby Lumber Lands Travel Analysis Report cannot cure any deficiencies in the Environmental Assessment because it is well settled that a site-specific project may not tier to a non-NEPA document. *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002).

What is left then is Defendants' assertion that the Environmental Assessment contains an analysis of the environmental impacts associated with

roads. This is merely one of the four factors required of 36 C.F.R. § 212.5(b)(1).

The Forest Service's implementation of a minimum road system without the

necessary analysis violates the Travel Management Rule, NEPA, and APA.

Because the Court has found a NEPA violation, it will not address Plaintiff's

remaining arguments concerning the lack of transparency regarding the number of

roads present in the Project area, the number of roads adopted by the minimum

road system, and how that number compares to the recommendation made in the

Travel Analysis Report, except to say the record could be clearer.[8]

Having found an unlawful minimum road system, it does not necessarily

follow that the Project's Decision Notice must be vacated and remanded for the

Forest Service to try again. At oral argument, Plaintiff and Defendants both agreed

that the decision to implement a minimum road system is wholly discretionary.

*Accord Bark v. United States Forest Serv.*, 393 F. Supp. 3d 1043, 1062 (D. Or.

2019), *rev'd and remanded on other grounds*, 958 F.3d 865 (9th Cir. 2020). At

least one district court implied that the appropriate remedy in such a circumstance

was simply to "set aside" that portion of the final decision. *Idaho Conservation*

*League v. Guzman*, 766 F. Supp. 2d 1056, 1078 (D. Idaho 2011). Because the

---

[8] For example, Defendants insist the minimum road system adopted by the Project will leave
228.8 miles of roads in the Project area. AR 005532. This also appears to be the same number
of roads that are currently present in the Project area. *Id.* Given the Decision Notice's assurance
that the Project will result in a net decrease in total road mileage, the Court is left to wonder if
the table actually implies that the Project will leave only 186.8 miles of roads after
implementation.

Court has found no other violations of the Project, the Court will adopt that remedy here.  The Court will remand without vacatur and instruct the Forest Service to strike any language in the Decision Notice which refers to the implementation of a minimum road system.  If the Forest Service wishes to adopt a minimum road system for the Project area, it may do so in a supplemental environmental assessment or as a stand-alone Project.  Either way, the error does not reach a magnitude that warrants halting the progress of an otherwise valid action.

IT IS ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 15) is GRANTED in part and DENIED in part.  Plaintiff prevails only on its challenge to the minimum road system.  The Court remands the Project without vacatur consistent with this Order.

IT IS FURTHER ORDERED that Defendants' Cross Motion for Summary Judgment (Doc. 18) is GRANTED in part and DENIED in part.  Defendants are granted summary judgment on Plaintiff's challenge to Management Area 8b and the Forest Plan Amendment.

IT IS FURTHER ORDERED that Defendants' Motion to Strike (Doc. 22) is GRANTED.  The Court strikes paragraphs 13, 15, 17, 18, and 20 of the Lonn Declaration (Doc. 16-1) and strikes paragraphs 6, 7, 8, 9, 10, 11, 12, and 13 of the Miller Declaration (Doc. 16-2).

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike (Doc. 25) is GRANTED in part and DENIED in part.  Plaintiff's motion is denied with respect to Doc. 10-1, Doc. 20-1, and AR 01580–81.  Plaintiff's motion is granted with respect to AR 015583 which is stricken from the record.

The Clerk of Court is directed to enter judgment of dismissal by separate document.

DATED this 29th day of September, 2020.

Dana L. Christensen, District Judge
United States District Court